**\*FOR PUBLICATION\***

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

—————————————————————— :
                                                              :
THOMAS E. ST. PIERRE, in his own          :
right and on behalf of all those similarly     :          Civ. Action No.: 15-2596 (FLW)(DEA)
situated,                                                       :
                                                              :                    **OPINION**
       Plaintiff,                              :
                                                              :
v.                                                            :
                                                              :
RETRIEVAL-MASTERS CREDITORS        :
BUREAU, INC.,                                          :
                                                              :
       Defendant.                          :
—————————————————————— :

**WOLFSON, United States District Judge:**

In this putative class action, Plaintiff Thomas E. St. Pierre ("Plaintiff") alleges that defendant Retrieval-Masters Creditors Bureau, Inc. ("Defendant") violated the Fair Debt Collection Practices Act (the "FDCPA" or the "Act"), 15 U.S.C. § 1692, et seq., because Defendant, a debt collector, mailed Plaintiff, and other similarly situated debtors, envelopes with glassine windows through which their account number and other personal information was visible. Presently before this Court is Defendant's motion to dismiss the Amended Complaint, pursuant to Fed. R. of Civ. P. 12(b)(1) and 12(b)(6). For the reasons set forth below, Defendant's motion to dismiss is **GRANTED**.

**I.        FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

The allegations in the Amended Complaint are straightforward.[1] Plaintiff alleges that he contracted with New Jersey E-ZPass ("E-ZPass") to participate in its electronic toll payment program (the "Agreement"), which allows tolls to be collected from an E-ZPass account through an electronic transponder. See Am. Compl. ¶¶ 19-20; Ex. A. Plaintiff alleges that, pursuant to the Agreement, he was required to maintain a prepaid balance, and, at the moment he passed through a lane accepting the electronic payment, E-ZPass would automatically deduct the required toll charge from his account balance.[2] Id. at ¶ 19; Ex. A. Plaintiff further alleges that, when he passed through a lane with insufficient funds in his account, he was subject to penalties for nonpayment of the toll. Id. at ¶¶ 23, 25; Ex. A.

Plaintiff asserts that Defendant sent him a collection letter, dated November 11, 2013, attempting to recover $60.06, which "constituted a combination of unpaid tolls and associated penalties…." Id. at ¶ 23. In the letter, Defendant advised Plaintiff that, because he had not "maintain[ed] a sufficient prepaid balance," E-ZPass revoked his privileges and assigned the

---

[1] Plaintiff's allegations in the Amended Complaint will be accepted as true. In addition, Plaintiff has attached several documents to the Amended Complaint, including the "E-ZPass Individual Agreement Terms and Conditions," as well as two collection letters from Defendant. Because these documents are attached to the Amended Complaint, the Court may consider them on this motion. See Frederico v. Home Depot, 507 F.3d 188, 201-02 (3d Cir. 2007); see Marks v. Struble, 347 F. Supp. 2d 136, 143 (D.N.J. 2004) (stating that, on a motion to dismiss, courts "generally only considers the allegations in the complaint, exhibits attached to the complaint, and public records," and that courts cannot consider matters extraneous to the pleadings).

[2] There are several different methods to replenish an E-ZPass prepaid balance. Id. at Ex. A. For example, an account holder can automatically replenish an account by providing E-ZPass with his credit or debit card information, or an account holder can periodically mail a check directly to E-ZPass. Id. It is unclear from the Amended Complaint which replenishment option Plaintiff utilized.

unpaid obligation to Defendant for collection.  Id. at Ex. B.  Defendant warned Plaintiff that the [c]ontinued use of your New Jersey E-ZPass tag will result in toll evasion violations and administrative fees."  Id.  In addition, Plaintiff alleges that, nearly seven months later, Defendant sent him another collection letter, dated June 16, 2014, attempting to recover "the amount of $1,200.75, which represented a combination of unpaid tolls and associated penalties."  Id. at ¶ 25; Ex. C.  Defendant also notified Plaintiff that "[t]he New Jersey Turnpike Authority retains the right to issue a summons for violating N.J.A.C. 19:9-9.2."  Id. at Ex. C.

Plaintiff does not challenge the validity of the underlying obligation to pay outstanding tolls and penalties.  Rather, in his single-count Amended Complaint, Plaintiff asserts that Defendant violated § 1692f(8) of the FDCPA "by sending E-ZPass collection letters to Plaintiff and members of the putative Class in envelopes with glassine windows through which their account numbers were made visible."[3]  Id. at ¶ 42; see id. at ¶ 27.  According to Plaintiff, the "disclosure of the account numbers… constitutes an invasion of privacy, a core concern animating the FDCPA," since it disseminates information about his "status as alleged debtor[], as well as [Defendant's] debt collection efforts."  Id. at ¶ 44.  Based on that alleged violation, and pursuant to § 1692k(a) of the FDCPA, Plaintiff seeks statutory damages plus costs and attorney's fees.

---

[3] In the Amended Complaint, Plaintiff alleges that the following individuals should be included in the class:

    a.    All natural persons with addresses in New Jersey;

    b.    to whom [Defendant] sent one or more E-ZPass collection letter(s);

    c.    which were enclosed in a glassine-window envelope that made visible the addressee's account number; and

    d.    which were dated anytime between February 26, 2014, and the date on which a class is certified in this action.

Id. at ¶ 30.

On March 2, 2015, Plaintiff filed the instant action in the Superior Court of New Jersey, Law Division, Ocean County.  On April 10, 2015, Defendant removed the action to this Court. Shortly after Defendant filed a motion to dismiss the Complaint, Plaintiff filed an Amended Complaint on June 22, 2015.  On August 17, 2015, Defendant filed a motion to dismiss the Amended Complaint, or, in the alternative, stay the action pending the outcome of the Supreme Court's decisions in Campbell-Ewald Co. v. Gomez, 136 S. Ct. 663 (2016) and/or Spokeo, Inc. v. Robins, 136 S. Ct. 1540 (2016).  On January 6, 2016, this Court ordered a stay of the proceedings. After the Supreme Court decided Spokeo, Plaintiff filed a motion to vacate the stay of proceedings. On June 16, 2016, this Court ordered that the stay be lifted, but administratively terminated the pending motion to dismiss.  On August 19, 2016, at the instruction of the Court, Defendant renewed its motion to dismiss the Amended Complaint, which Plaintiff has opposed.

## II.     STANDARD OF REVIEW

Under Rule 12(b)(6), a complaint may be dismissed for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  When reviewing a motion to dismiss on the pleadings, courts "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief."  Phillips v. Cnty. of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008) (internal quotation marks omitted).  Under such a standard, the factual allegations set forth in a complaint "must be enough to raise a right to relief above the speculative level."  Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007).  Indeed, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  "[A] complaint must do more than allege the plaintiff's

entitlement to relief.  A complaint has to 'show' such an entitlement with its facts." <u>Fowler v. UPMC Shadyside</u>, 578 F.3d 203, 211 (3d Cir. 2009).

However, Rule 12(b)(6) only requires a "short and plain statement of the claim showing that the pleader is entitled to relief" in order to "give the defendant fair notice of what the… claim is and the grounds upon which it rests." <u>Twombly</u>, 550 U.S. at 555.  The complaint must include "enough factual matter (taken as true) to suggest the required element.  This does not impose a probability requirement at the pleading stage, but instead simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element." <u>Phillips</u>, 515 F.3d at 234 (internal quotation marks and citation omitted); <u>Covington v. Int'l Ass'n of Approved Basketball Officials</u>, 710 F.3d 114, 118 (3d Cir. 2013) ("[A] claimant does not have to set out in detail the facts upon which he bases his claim.  The pleading standard is not akin to a probability requirement; to survive a motion to dismiss, a complaint merely has to state a plausible claim for relief.") (internal quotation marks and citation omitted).

In sum, under the current pleading regime, when a court considers a dismissal motion, three sequential steps must be taken: first, "it must take note of the elements the plaintiff must plead to state a claim." <u>Connelly v. Lane Const. Corp.</u>, 809 F.3d 780, 787 (3d Cir. 2016) (internal quotations marks and brackets omitted).  Next, the court "should identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth." <u>Id.</u> (internal quotation marks omitted).  Lastly, "when there are well-pleaded factual allegations, the court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." <u>Id.</u> (internal quotation marks and brackets omitted).

## III.  DISCUSSION

Defendant argues that the Amended Complaint should be dismissed because Plaintiff has failed to allege a concrete harm sufficient to establish Article III standing.  In the alternative, Defendant contends that the obligation it seeks to recover – the delinquent toll charges and penalties – is not a "debt" as defined by the FDCPA.  In response, Plaintiff contends that he has alleged sufficient concrete harm because Defendant disclosed his private information by sending two collection letters that made visible his account number.  Moreover, Plaintiff argues that Defendant was attempting to collect a "debt" within the meaning of the FDCPA, because the obligation to pay the outstanding tolls and penalties arose from the E-ZPass Agreement, which is a consensual transaction.  I turn first to the standing question.

a.    **ARTICLE III STANDING**

Article III of the United States Constitution limits the scope of federal courts to actual "cases" or "controversies."  <u>See</u> U.S. Const., art. III, § 2.  "The [standing] doctrine developed in our case law to ensure that federal courts do not exceed their authority as it has been traditionally understood," and, as a result, "[t]he doctrine limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong."  <u>Spokeo, Inc.</u>, 136 S. Ct. at 1547; <u>see</u> <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560-61 (1992).  Article III standing consists of three irreducible elements: "[t]he plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  <u>Spokeo, Inc.</u>, 136 S. Ct. at 1547 (citing <u>Lujan</u>, 504 U.S. at 560-61).

Here, Defendant's argument centers entirely on the injury-in-fact element, and more specifically, the requirement that an injury be concrete.  Generally speaking, to demonstrate an injury-in-fact, "a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or

hypothetical.'" Id. at 1548 (quoting Lujan, 504 U.S. at 560). In order for an injury to be particularized, "it 'must affect the plaintiff in a personal and individual way.'" Id. (quoting Lujan, 504 U.S. at 560 n.1). In addition, "[a]n injury in fact must also be 'concrete.'" Id. While courts have sometimes conflated the particularization and concreteness requirements of standing, the Supreme Court in Spokeo explained that "[a] 'concrete' injury must be '*de facto*'; that is, it must actually exist." Id. (citation omitted). The Court continued, "[w]hen we have used the adjective 'concrete,' we have meant to convey the usual meaning of the term – 'real,' and not 'abstract.'" Id. (citation omitted). While "[c]oncreteness… is quite different from particularization," the Court explained that "'[c]oncrete' is not, however, necessarily synonymous with 'tangible.'" Id. at 1548-49.

Both tangible and intangible harms can be sufficiently concrete to establish an injury in fact. Id. at 1549 ("Although tangible injuries are perhaps easier to recognize, we have confirmed in many of our previous cases that intangible injuries can nevertheless be concrete."). With respect to intangible injuries, courts must consider "both history and the judgment of Congress...." Id. The Supreme Court has established "two tests for whether an intangible injury can… be 'concrete.'" In re Horizon Healthcare Servs. Inc. Data Breach Litig., 846 F.3d 625, 637 (3d Cir. 2017) (citing Spokeo, Inc., 136 S. Ct. at 1549). With respect to the first test, courts must determine whether the "harm has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts." Spokeo, Inc., 136 S. Ct. at 1549. If the answer is affirmative, "it is likely to be sufficient to satisfy the injury-in-fact element of standing." In re Horizon, 846 F.3d at 637.

In the absence of a close relationship, courts must next determine whether Congress has identified and elevated the alleged harm "to the status of [a] legally cognizable injur[y]." Id.

(alteration in original) (internal quotation marks omitted) (quoting Spokeo, Inc., 136 S. Ct. at 1549). Congress plays an important and instructive role in defining cognizable injuries "that were previously inadequate in law." Spokeo, Inc., 136 S. Ct. at 1549 (internal quotation marks omitted) (quoting Lujan, 504 U.S. at 578). However, "Congress' role in identifying and elevating intangible harms does not mean that a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right." Id. Rather, an intangible harm satisfies the concreteness requirement when "Congress has expressed an intent to make an injury redressable." In re Horizon, 846 F.3d at 637. It is insufficient for a plaintiff to "allege a bare procedural violation, divorced from any concrete harm, and satisfy the injury-in-fact requirement…." Spokeo, Inc., 136 S. Ct. at 1549.

The Third Circuit has recently discussed the impact of Spokeo on Article III standing in connection with the dissemination of private information, but under the Fair Credit Reporting Act (the "FCRA"). See In re Nickelodeon Consumer Privacy Litig., 827 F.3d 262, 272-74 (3d Cir. 2016) (holding that complaints of unauthorized tracking and dissemination of the plaintiffs' online activities is sufficiently concrete to establish Article III standing); see also In re Horizon, 846 F.3d at 635-42. In Horizon, the plaintiffs asserted a claim for violation of the FCRA, alleging that the defendant, Horizon Blue Cross Blue Shield of New Jersey, did not adequately safeguard their personal information – names, dates of birth and social security numbers – against theft. See In re Horizon, 846 F.3d at 629-30. Specifically, the plaintiffs alleged that "two laptop computers containing the unencrypted personal information of [the plaintiffs] and more than 839,000 other Horizon members were stolen from Horizon's headquarters in Newark, New Jersey." Id. at 630.

In reversing and remanding to the district court, the Third Circuit held that, "[i]n light of the congressional decision to create a remedy for the unauthorized transfer of personal information,

8

a violation of the FCRA gives rise to an injury sufficient for Article III standing purposes."  Id. at 629.  The Third Circuit reasoned that "'unauthorized disclosures of information' have long been seen as injurious."  Id. at 638 (quoting In re Nickelodeon, 827 F.3d at 274).  Although the court stated that "[w]e are not suggesting that Horizon's actions would give rise to a cause of action under common law," it explained that, "with the passage of the FCRA, Congress established that the unauthorized dissemination of personal information by a credit reporting agency causes an injury in and of itself – whether or not the disclosure of that information increased the risk of identity theft or some other future harm."  Id. at 639.  Because Congress "created a private right of action to enforce the provisions of the FCRA, and even allowed for statutory damages for willful violation," the court determined that Congress expressed a clear intent to make the unauthorized disclosure of personal information redressable.  Id. (stating that, based on its actions, it is clear that "Congress believed that the violation of FCRA causes a concrete harm to consumers.").  Indeed, the Third Circuit concluded that the unauthorized dissemination of private information is "the very injury that FCRA is intended to prevent," and, as a result, "[t]here is… a *de facto* injury that satisfies the concreteness requirement for Article III standing."  Id. at 640.

While the Third Circuit has not addressed whether a violation of the FDCPA can give rise to a concrete injury, courts in this district have considered that question in light of Spokeo.  See, e.g., Thomas v. Youderian, No. 16-1408, 2017 U.S. Dist. LEXIS 16585, at *17-21 (D.N.J. Feb. 3, 2017) (finding concrete injury where the plaintiff allegedly received a collection letter notifying him that a small convenience fee would be charged for payments made by credit card); Carney v. Goldman, No. 15-260, 2016 U.S. Dist. LEXIS 177087, at *13-16 (D.N.J. Dec. 22, 2016) (holding that the plaintiffs satisfied the concreteness requirement of standing, when they alleged that the debt collector misstated the amount of debt owed in their collection letters); Blaha v. First Nat'l

Collection Bureau, Inc., No. 16-2791, 2016 U.S. Dist. LEXIS 157575, at *22-24 (D.N.J. Nov. 10, 2016) (concluding that the allegation that the debt collector misrepresented the legal status of the debt in the collection letter is sufficiently concrete to confer Article III standing); cf. Benali v. AFNI, Inc., No. 15-3605, 2017 U.S. Dist. LEXIS 783, at *16-17 (D.N.J. Jan. 4, 2017) (holding, on a motion for summary judgment, that the plaintiff did not establish a concrete injury because, based on his testimony that he knew the debt was not actually his, there was no risk that plaintiff would have paid the convenience fee). Following Spokeo, courts in this district have addressed constitutional standing in two different FDCPA contexts: (i) violations of § 1692e for false, deceptive and misleading statements; and (ii) violations of § 1692f for the use of unfair and unconscionable means in collecting a debt.

With respect to violations of § 1692e, courts in this district "trend in favor of finding concrete injury under the FDCPA where the amount or validity of the debt has been misstated." Thomas, 2017 U.S. Dist. LEXIS 16585, at *16. Shortly after the Supreme Court decided Spokeo, the court in Blaha concluded that the plaintiff had established a concrete injury-in-fact, where she alleged that the defendant sent a collection letter to the plaintiff with a settlement offer on a time barred debt, but the defendant failed to disclose the legal status of that debt. See Blaha, 2016 U.S. Dist. LEXIS 157575, at *22-24. The court reasoned that Congress enacted the FDCPA "to eliminate abusive debt collection practices and to promote further action to protect consumers against debt collection abuses," and that the allegation that the defendant made false and misleading statements to plaintiff about the status of the debt "is precisely [the harm] that [] the statute was intended to guard against." Id. at *23. Similarly, in Carney, the plaintiff alleged that the defendant violated the FDCPA when it sent collection letters to the plaintiff containing false and misleading statements about the amount of debt owed. See Carney, 2016 U.S. Dist. LEXIS

177087, at *13-16.  The court held that, because "[t]he FDCPA unambiguously grants recipients of debt-collection letters… a right to be free from abusive collection practices," including the use of false and misleading representations, the plaintiff sufficiently alleged the concreteness requirement under Article III.  Id. at *14-16.

In connection with violations of § 1692f, which prohibits the use of unfair and unconscionable debt collection practices, courts in this district have only addressed the issue of whether a collection letter that notifies the debtor that he will be assessed a convenience charge for paying the debt with a credit card constitutes a concrete injury.  See Benali, 2017 U.S. Dist. LEXIS 783, at *16-17; Thomas, 2017 U.S. Dist. LEXIS 16585, at *17-21.  On a motion for summary judgment, the court in Benali concluded that the plaintiff did not suffer an injury in fact, since the risk of harm was entirely conjectural and hypothetical.  See Benali, 2017 U.S. Dist. LEXIS 783, at *17.  In reaching that conclusion, the court relied exclusively on the plaintiff's own testimony that "the alleged 'debt' was not his, and he knew it immediately upon receiving the [c]ollection [l]etter."  Id. at *14.  Based on those admissions, the court found that "there was no risk that [the plaintiff] would pay the $4.95 processing fee because he never had an account with AT&T and immediately believed the [c]ollection [l]etter to be a 'scam.'"  Id. at *16.

On a motion to dismiss, the court in Thomas reached a different conclusion.  See Thomas, 2017 U.S. Dist. LEXIS 16585, at *17-21.  In that case, the plaintiff alleged that he received a collection letter stating that the debt collector would impose a convenience charge if the plaintiff opted to pay the reported debit with a credit card.  Id. at *1.  While the court noted that the allegations were barely enough to establish standing – because the plaintiff never actually paid the convenience fee – the court concluded that the plaintiff satisfied the concreteness requirement.  Id. at *17, 20-21.  In so holding, the court reasoned that, based on the deceptive language in the

11

collection letter, the plaintiff was "at the risk of being misled into paying the [convenience fee]" or, in the alternative, "at risk of foregoing the convenience of paying the bill on credit (or, I suppose, at risk of giving up on paying for it for lack of ready money)." Id. at *19-20.  Although the risk of harm was slight, the court found that it was still present, since the "[d]eprivation of the right to be free from false or deceptive collection information, with the attendant risk of economic injury, is an interest recognized by the [FDCPA], and one reasonably rooted in the traditions of the common law." Id. at *20.

While no court in the Circuit has confronted the exact issue present in this matter, this Court is guided by the Third Circuit's decisions in both Horizon and Nickelodeon, as well as the courts in this district that have applied Spokeo to claims under the FDCPA.  In enacting the FDCPA, Congress' overarching purpose was "to eliminate abusive debt collection practices by debt collectors, to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses."  15 U.S.C. § 1692(e); see Douglass v. Convergent Outsourcing, 765 F.3d 299, 301-02 (3d Cir. 2014).  In order to further that purpose, Congress enacted § 1692f, which "sets out a nonexclusive list of conduct that qualifies as unfair or unconscionable." Douglass, 765 F.3d at 302.  Relevant to this matter, § 1692f(8) prohibits a debt collector from "[u]sing any language or symbol, other than the debt collector's address, on any envelope when communicating with a consumer by use of the mails or by telegram, except that a debt collector may use his business name if such name does not indicate that he is in the debt collection business."  15 U.S.C. § 1692f(8).  In Douglass, the Third Circuit expressly held that § 1692f(8) prohibits a debt collector from mailing an envelope with a glassine window that shows the account number of the debtor, since the "disclosure implicates a core concern animating the

12

FDCPA – the invasion of privacy." Douglass, 765 F.3d at 303. The court explained that "[t]he account number is a core piece of information pertaining to [the plaintiff's] status as a debtor and [the defendant's] debt collection effect. Disclosed to the public, it could be used to expose [the plaintiff's] financial predicament." Id.

Here, Plaintiff alleges that Defendant engaged in unfair and unconscionable conduct, in violation of § 1692f(8) of the FDCPA, when it mailed Plaintiff collection letters in envelopes that disclosed his account number, and, as a result, disseminated his private information to the public at large. See Am. Compl. at ¶¶ 27, 42-44. Historically, the right to privacy is an interest that is deeply rooted in the traditions of the common law, and Congress has often elevated the disclosure of certain private information to the status of a cognizable harm. See In re Nickelodeon, 827 F.3d at 274; In re Horizon, 846 F.3d at 638-39; see also Thomas, 2017 U.S. Dist. LEXIS 16585, at *13. Indeed, with the passage of the FDCPA, Congress manifested a clear intent to make the unfair and unconscionable disclosure of private information redressable, especially considering that one of Congress' stated purposes was to eradicate "invasions of individual privacy." 15 U.S.C. § 1692(a); see Douglass, 765 F.3d at 303; see also Thomas, 2017 U.S. Dist. LEXIS 16585, at *13. In order to achieve that goal, Congress explicitly elevated the right to be free from a debt collector "[u]sing any language or symbol… on any envelope when communicating with a consumer" by mail or telegram. 15 U.S.C. § 1692f(8); see Douglass, 765 F.3d at 303-04. As explained by the Third Circuit in Douglass, under that particular provision of the Act, Plaintiff has a right to be free from Defendant disclosing his private information, including his account number, on any debt collection envelope. See Douglass, 765 F.3d at 303. Indeed, Plaintiff has alleged that Defendant violated that legally protected interest. Accordingly, because the FDCPA unambiguously grants Plaintiff a statutory right to be free from the disclosure of private information that could expose his status

as an alleged debtor, and that the right to privacy is an interest that has long been recognized at law, the Court concludes that Plaintiff has adequately alleged the concreteness requirement under Article III.[4]

**b.**    **THE FDCPA – <u>TOLLS AND PENALTIES DO NOT CONSTITUTE A DEBT</u>**

The Act "is a consumer protection statute that prohibits certain abusive, deceptive, and unfair debt collection practices." <u>Marx v. General Revenue Corp.</u>, 133 S. Ct. 1166, 1171 n.1 (2013) (citing 15 U.S.C. § 1692). In order to state a claim under the FDCPA, "a plaintiff must prove that (1) [he] is a consumer, (2) the defendant is a debt collector, (3) the defendant's challenged practice involves an attempt to collect a 'debt' as the Act defines it, and (4) the defendant has violated a provision of the FDCPA in attempting to collect the debt." <u>Douglass</u>, 765 F.3d at 303. Here, Defendant argues that the delinquent tolls and penalties are not "debts" under the FDCPA, and, as a result, the Court must determine whether those particular obligations fall within the purview of the Act – an issue that only a few federal courts throughout the country have previously addressed.

Under the statute, "[a] threshold requirement… is that the prohibited practices are used in an attempt to collect a 'debt.'" <u>Zimmerman v. HBO Affiliate Grp.</u>, 834 F.2d 1163, 1167 (3d Cir. 1987); <u>see</u> <u>Pollice v. Nat'l Tax Funding, L.P.</u>, 225 F.3d 379, 400 (3d Cir. 2000); <u>see also</u> <u>Sanon-</u>

---

[4] Finally, although Defendant does not argue that Plaintiff has failed to allege a particularized harm, there is no doubt that Plaintiff's alleged injury is, in fact, particularized, because Plaintiff alleges that he personally received two collection letters from Defendant that had a glassine window that disseminated his account number, and the obligation to pay the unpaid tolls and penalties "is said to be his." <u>See</u> <u>Spokeo, Inc.</u>, 136 S. Ct. at 1548; <u>see also</u> <u>Thomas</u>, 2017 U.S. Dist. LEXIS 16585, at *9 (holding that "[t]here is no doubt that… [the] alleged injury is particularized; it clearly is, because [the plaintiff] personally received the [collection letter], and the debt reported therein is said to be his.").

Lauredant v. LTD Fin. Servs., L.P., No. 15-6529, 2016 U.S. Dist. LEXIS 81030, at *5 (D.N.J. June 22, 2016).  "Debt" is defined as "any obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money, property, insurance, or services which are the subject of the transaction are primarily for personal, family, or household purposes…."  15 U.S.C. § 1692a(5).  Although Congress has not defined the term "transaction," the Third Circuit has explained that the "debt" must arise out of a pre-existing relationship in which a debtor voluntarily elects to avail himself of either consumer goods or services.  See Pollice, 225 F.3d at 401; Staub v. Harris, 626 F.2d 275, 278 (3d Cir. 1980); see also Piper v. Portnoff Law Assocs., 396 F.3d 227, 233 n.8 (3d Cir. 2005).  That consumer "transaction" can be established through either an express contractual relationship or a consensual arrangement.  See Gross v. Maitlin, 519 Fed. Appx. 749, 751 (3d Cir. 2013).  In the instant matter, the parties do not dispute that Plaintiff and E-ZPass entered into an express contractual relationship, as evidenced by the Agreement.

However, the mere existence of a contractual relationship does not end the inquiry, since there are two parts to the statutory definition of "debt" that require further explanation and consideration.  See 15 U.S.C. § 1692a(5).  Specifically, the Court must first determine whether the obligation to pay arises from a consumer transaction that is "primarily for personal, family, or household purposes."  Id.  The Third Circuit in Pollice has provided some guidance on the scope of that particular language.  See Pollice, 225 F.3d at 400-03.  For example, the court concluded that the obligation to pay government entities for water and sewer services constituted a "debt," because the "homeowners ('consumers' of water and sewer services) had an 'obligation… to pay money' to the government entities which arose out a 'transaction' (requesting water and sewer service) the subject of which was 'services… primarily for personal, family, or household purposes."  Id. at 400 (alteration in original).  However, the Third Circuit has distinguished water

15

and sewer obligations from property tax obligations, specifically holding that a homeowner's tax obligation is not a "debt" because "the obligation to pay arose from the levying of taxes upon the ownership of property." Id. at 401-02; see Staub, 626 F.2d at 277-79.  The paramount distinction is that the tax obligation does not arise from a consensual consumer "transaction," see Pollice, 225 F.3d at 402 (stating that "the property taxes… arose not from the purchase of property but from the fact of ownership."), because paying taxes is obligated under law.

The obligation to pay delinquent tolls, here, can be likened to a tax, as discussed in Pollice, and not like an obligation to pay outstanding water and sewer services for personal household use. This distinction is important.  In Pollice, the Third Circuit found the homeowners' obligation was created by their subscription with the governmental entity for water and sewer services, and those services were used for "personal, family, or household purposes."[5]  15 U.S.C. § 1692a(5).  The court stressed that the homeowners consumed the water and sewer services, within the confines of their home, for their personal benefit, which is "the type of pro tanto exchange which the statutory definition [of 'debt'] envisages."  Pollice, 225 F.3d at 401 (alteration in original) (internal quotation marks omitted) (quoting Staub, 626 F.2d at 278).  However, the relationship between Plaintiff and E-ZPass, an agent of the State authorized to administer the electric toll collection program, stands on a vastly different footing than a traditional consumer relationship.  Indeed, critically, tolls are akin to taxes because the funds from tolls are used for more general purposes. See Staub, 626 F.2d at 278 (holding that taxes are not a "debt" under the FDCPA, since "[t]axes are used for more general purposes; they are not limited to the statutory purposes.").  In enacting

---

[5] In Pollice, the Third Circuit distinguished between homeowners and persons that own the property for business purposes, explaining that "the water and sewer obligations owed by [persons] who own their property for business purposes are not 'debts' because the services are not 'primarily for personal, family, or household purposes.'"  Pollice, 225 F.3d at 400 n.23.  In his Amended Complaint, Plaintiff does not allege that he utilized the tolls roads for business purposes.

N.J.S.A. § 27:23-1, the Legislature sought "to facilitate vehicular traffic and remove the present handicaps and hazards on the congested highways in the State, and to provide for the acquisition and construction of modern express highways...."  N.J.S.A. § 27:23-1.  In order to achieve that goal, the Legislature authorized the Authority to use the revenue collected from tolls "to acquire, construct, maintain, improve, manage, repair and operate transportation projects...."  Id.; see N.J.S.A. § 27:23-5(e).  Unlike a traditional consumer relationship, but like revenue generated by taxes, revenue generated from tolls is used for the benefit of the public at large, including the construction, maintenance and improvement of the roads.  See Staub, 626 F.2d at 278 (stating that taxes "provide funds for such nonpersonal purposes as… roads… and other governmental services.").  Thus, the obligation to pay tolls does not arise from a transaction that is "primarily for personal, family, or household purposes."  15 U.S.C. § 1692a(5).

Nevertheless, relying on Brown v. Transurban USA, Inc., 144 F. Supp. 3d 809 (E.D. Va. 2015) and Yunker v. AllianceOne Receivables Mgmt., No. 10-61796, 2011 U.S. Dist. LEXIS 159445 (S.D. Fla. July 18, 2011), Plaintiff contends that Defendant was attempting to collect a "debt" because Plaintiff and E-ZPass entered into a consensual consumer transaction, and that the Agreement is the source of his obligation to pay the unpaid tolls and penalties.  In response, Defendant relies on Yazo v. Law Enforcement Sys., Inc., No. 08-3512, 2008 U.S. Dist. LEXIS 93345 (C.D. Cal. Nov. 7, 2008) to argue that the obligation to pay toll charges and violation penalties does not arise out of the consumer transaction between Plaintiff and E-ZPass, but rather, the obligation arises out of New Jersey state law, and hence, is not a "debt."  Thus, the Court must determine whether the obligation to pay the outstanding tolls and penalties "arises out of" the Agreement.

In <u>Yazo</u>, the plaintiff, who was not enrolled in an electronic toll collection program, asserted a FDCPA claim against a debt collector for attempting to recover unpaid roadway tolls and penalties.  <u>See Yazo</u>, 2008 U.S. Dist. LEXIS 93345, at *1-2.  The district court disagreed and held that such obligations are not "debts" within the meaning of the FDCPA.  <u>See id.</u> at *6-9.  The court reasoned that "an obligation arising from the violation of a law or the commission of a tort is not the result of a consensual transaction."  <u>Id.</u> at *6.  Addressing the penalties first, the court determined that, "[b]ecause these are fines imposed as a result of a statutory violation, they were not incurred through a consensual transaction…."  <u>Id.</u> at *7.  With respect to the tolls, the court reasoned that "toll road use is only consensual in certain situations," under the California vehicle code.  <u>Id.</u> at *7-8.  Since the use of toll roads without paying the toll violates California law, the court held that it "cannot conclude that the obligation to pay arose out of a consensual consumer transaction, and therefore finds that it is outside of the scope of 'debt' as contemplated by the FDCPA."  <u>Id.</u> at *8.  Although the plaintiff in <u>Yazo</u> did not participate in an electronic toll collection program, unlike Plaintiff in this case, the decision is nevertheless consistent with a well-established proposition: under the FDCPA, an obligation is not a "debt" if that obligation arises out of the operation of law, as opposed to a consensual consumer "transaction."  <u>See Pollice</u>, 225 F.3d at 400-02; <u>see also</u> <u>Franklin v. Parking Revenue Recovery Servs., Inc.</u>, 832 F.3d 741, 744 (7th Cir. 2016); <u>Agrelo v. Affinity Mgmt. Servs., LLC</u>, 841 F.3d 944, 951 (11th Cir. 2016) (stating that an obligation is not a "debt" under the Act "where the obligation to pay arises solely by operation of law," including, for example, "government-imposed fine[s]").

In contrast, in <u>Brown</u>, the plaintiffs alleged that they had enrolled in the E-ZPass program, and that they satisfied "the requirements of the program [by] properly mounting the E-ZPass device on their windshields and linking their E-ZPass accounts to a valid credit card."  <u>Brown</u>, 144

F. Supp. 3d at 842.  The plaintiffs asserted that the E-ZPass equipment wrongfully registered toll violations, even though their accounts were valid and fully funded.  Id.  The court determined that "the alleged toll violations at issue [there] are properly understood as 'consensual transactions.'" Id.  Although the reasoning is thin, the court found that "[p]laintiffs [] contracted with E-ZPass for a transponder that communicates with toll collection booths across the country.  In most regions of the country, this allows for more efficient travel.  Indeed, motorists with an E-ZPass transponder need not wait in the 'cash only' lines at toll booths, but instead, can continue driving through the 'E-ZPass' lane, typically without delay."  Id.

In Yunkers, the court reached the same conclusion as in Brown, holding that the collection of delinquent tolls was a "debt" because the plaintiff "entered into the SunPass Agreement for 'personal purposes.'"  Yunkers, 2011 U.S. Dist. LEXIS 159445, at *7.  The plaintiff, there, alleged that she participated in the SunPass program, an electronic toll collection program in Florida, and, when she failed to replenish her prepaid account and incurred a balance of unpaid tolls, the Florida Department of Transportation assigned the obligation to a collection agency.  Id. at *1-2.  In holding that the obligation was covered under the FDCPA, the court reasoned that the plaintiff "agreed in the SunPass Agreement to pay in accordance with its terms for services consisting of the issuance and use of a transponder and a pre-paid account for the payment of tolls, and further agreed that she would be liable for any deficiencies in her prepaid account or any other charges associated with the collection of such deficiencies."  Id. at *7.  The court further reasoned that the plaintiff "was not compelled to enter into the SunPass Agreement… [because] she had the choice of paying tolls at the booths by tendering cash either to the attendants or into a machine that accepts cash…."  Id. at *8.  Indeed, the court distinguished the decision in Yazo, where the plaintiff in that case was not enrolled in an electronic toll collection program, on the grounds that the plaintiff in

19

<u>Yunkers</u> "clearly chose [to enter into the SunPass Agreement and abide by its terms] pursuant to which she is now obligated for an indebtedness."  <u>Id.</u>

While the courts in <u>Brown</u> and <u>Yunkers</u> both addressed delinquent tolls and penalties in connection with participants in electronic toll collection programs, this Court respectfully disagrees with their conclusion that, when a person contracts with an electronic toll collection provider, the arrangement somehow changes or alters the underlying source of the obligation to pay those tolls and penalties.  Although the Third Circuit has not directly addressed the "arising out of" language in § 1692a(5), the Seventh Circuit has recently held that such a phrase "limits the FDCPA's reach to only those obligations that are created by the *contracts* the parties used to give legal force to their transaction."  <u>Franklin</u>, 832 F.3d at 744 (emphasis in original).  The court explained that, generally speaking, an obligation is a "debt" when the source of the obligation is contract law, but "efforts to collect on obligations that are created by other kinds of legal authorities, like tort law or traffic regulations, are not covered by the FDCPA."  <u>Id.</u>  In <u>Franklin</u>, the plaintiffs alleged that they parked their cars at a publicly owned parking lot that was managed by a private company, and that they subsequently received collection letters from the defendant, a debt collector, because the private company "claim[ed] they parked without paying and now owe the $1.50 parking fee and a $45 nonpayment penalty."  <u>Id.</u> at 743.  In holding that the unpaid fees and penalties were "debts" under the Act, the Seventh Circuit concluded that "it's clear that contract law *is* the source of the obligation at issue here" because, by parking in the lot, "a contract was formed obligating [the plaintiffs] to pay the stated price or pay a higher price if they left the parking lot without paying."  <u>Id.</u> at 744 (emphasis in original).  In determining the source of the obligation, the court reasoned that, even though the parking lot was owned by a public entity, "no municipal ordinance or regulation obligates park-and-dashers to pay the $45 [nonpayment

penalty]; that obligation comes from the contract that is formed when a customer parks in the lot." Id.  In fact, the court found that "[t]hese obligations have no source in municipal law."  Id. at 745.

In both Brown and Yunkers, the courts concluded that unpaid tolls and penalties are a "debt" because the plaintiffs obtained some benefit from being enrolled in the electronic toll collection program.  However, those courts never discussed the source of the obligation, and therefore, ignored the "arising out of" analysis.  Here, Plaintiff's obligation to pay the outstanding tolls and penalties did not arise out of the Agreement between Plaintiff and E-ZPass; instead, it is clear that New Jersey state law is the source of the obligation at issue.  When any individual opts to travel on the New Jersey Turnpike (the "Turnpike") or the Garden State Parkway (the "Parkway"), state law establishes the obligation to pay the tolls, which are prescribed by the New Jersey Turnpike Authority (the "Authority").  See N.J.S.A. § 27:23-25; N.J.A.C. § 19:9-1.19.  In addition to paying with currency or coin, the New Jersey Legislature has expressly authorized the electronic payment of tolls.  See N.J.S.A. § 27:23-34.1 to -3; see N.J.A.C. § 19:9-9.1 to -3. Electronic toll collection systems, like E-ZPass, are "utilized by the Authority to register and collect the toll required to be paid for a vehicle entering a toll plaza owned and/or operated by, or upon the behalf of, the Authority."  N.J.A.C. § 19:9-9.1.  Generally, no individual is allowed to make use of toll roads without paying the required toll.  See N.J.S.A. § 27:23-25; see also N.J.A.C. § 19:9-1.19.  In particular, the regulations provide that any individual utilizing the electronic toll payment program cannot "refuse to pay, evade or attempt to evade the payment of the toll for passage of a vehicle on a Roadway, unless an exemption exists for the payment of the required toll."  N.J.A.C. § 19:9-9.2(a); see N.J.S.A. § 27:23-34.2 to -3.  When an individual fails to comply with the electronic toll collection rules and regulations, "the Authority or its agent [such as E-ZPass] may send an Advisory and Payment Request to the owner of the violating vehicle by regular

21

mail…, [and] [u]pon receipt of the Advisory and Payment Request, the owner of the violating vehicle shall pay to the Authority or its agent, the proper toll and an administrative fee in the amount of $50.00 per violation or such other amount as may be established by duly adopted rule." N.J.A.C. § 19:9-9.2(b); see N.J.S.A. § 27:23-34.2.

In the instant matter, Plaintiff contracted with E-ZPass to participate in its electronic toll collection program.  See Am. Compl. at Ex. A.  In exchange for more efficient travel on New Jersey toll roads, Plaintiff paid E-ZPass a small cash deposit for the use of the electronic transponder, along with a monthly membership fee of one dollar.  See id.  In addition, in accordance with the Agreement, Plaintiff was required to maintain a prepaid balance in his account to cover toll charges, and E-ZPass was authorized to deduct those charges each time Plaintiff used his transponder.  See id.  However, because Plaintiff allegedly failed to maintain a sufficient prepaid balance, at the moment he passed through the lanes accepting E-ZPass, he was unable (or, unwilling) to pay the required tolls, triggering certain penalties.  Like the court in Yazo concluded, because the use of New Jersey toll roads without payment violates state law, that obligation does not arise out of the E-ZPass Agreement.  Indeed, it is of no moment that Plaintiff had an Agreement with E-ZPass, the third-party administrator tasked with collecting tolls on behalf of the State, since that Agreement is not the source of the obligation.  The Agreement only pertains to the manner in which Plaintiff paid tolls, i.e., requiring a minimum prepaid balance and outlining the proper usage of the transponder.  The fact remains, however, that the "debt" alleged in this case arose out of Plaintiff's obligation to pay tolls under New Jersey law.[6]  Accordingly, because the obligation to

---

[6] Although this issue is not before the Court, because Plaintiff specifically alleges that Defendant was attempting to collect unpaid tolls and penalties, it is possible that certain obligations, unrelated to tolls and penalties, may arise out of the Agreement.  For example, if Plaintiff failed to pay the monthly membership fee of one dollar, that obligation could arguably be considered a "debt" because it was created by the Agreement, and not by operation of law.

pay tolls clearly arises out of state law, and because the use of toll roads is not "primarily for personal, family, or household purposes," but for the benefit of the general public, the Court holds that Plaintiff's obligation to pay delinquent tolls does not constitute a "debt" within the meaning of the FDCPA.

Similarly, the obligation to pay penalties for nonpayment clearly arises out of New Jersey state law, and courts have held that penalties imposed as a result of a statutory violation fall outside the scope of the FDCPA.  See Gulley v. Markoff & Krasny, 664 F.3d 1073, 1074 (7th Cir. 2011) ("The text, as we read § 1692a(5), defines 'debt' in a manner that necessarily excludes fines from coverage."); see also Yazo, 2008 U.S. Dist. LEXIS 93345, at *7.  Tellingly, the Agreement provides that E-ZPass is permitted to assess "penalties as provided by law," including the imposition of a $50 administrative fee for each violation, which is the same penalty imposed by N.J.A.C. § 19:9-9.2(b).  See Am. Compl. at Ex. A.  Accordingly, since none of the obligations that Defendant attempted to recover from Plaintiff arise out of the Agreement, the Court dismisses Plaintiff's Amended Complaint because Defendant was not attempting to collect a "debt" within the meaning of the FDCPA.

## IV.     CONCLUSION

For the reasons set forth above, Defendant's motion to dismiss the Amended Complaint is **GRANTED**.

DATE: March 24, 2017                                          /s/ Freda L. Wolfson
                                                             The Honorable Freda L. Wolfson
                                                             United States District Judge